Filed 7/31/25  Smith v. Robinson CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BUDINA SMITH, Plaintiff and Appellant, v. RICHARD ROBINSON, Defendant and Respondent. | F086108 (Super. Ct. No. 17CV-00110) OPINION |

APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

Dolan Law Firm, Christopher B. Dolan, Matthew D. Gramly; Sharon J. Arkin for Plaintiff and Appellant.

McCormick, Barstow, Sheppard, Wayte & Carruth and Todd W. Baxter for Defendant and Respondent.

-ooOoo-

The trial court granted, on the day of trial, a dispositive motion in limine brought by the defendant in this medical malpractice action.  The plaintiff appealed.  We reverse the judgment and remand the matter for further proceedings consistent with this opinion.

# FACTUAL AND PROCEDURAL BACKGROUND

## A.     The Complaint

On January 12, 2017, Budina Smith filed a complaint for damages against Richard Robinson, M.D. in the Merced County Superior Court.  The complaint alleged two causes of action against Robinson:  (1) medical negligence, and (2) general negligence/res ipsa loquitur.

The complaint made the following general allegations.  In January 2011, Robinson "surgically implanted a 6.6 French subclavian chemo port catheter into [the left side of Smith's] chest in the course of providing medical care to her."  The procedure was performed at University Surgery Center.  On April 9, 2012, Robinson "surgically removed the 6.6 French subclavian chemo port and catheter from [Smith's] chest in the course of providing medical care to her."  This procedure was also conducted at University Surgery Center.

The complaint further alleged:  "In the course of performing the April 9, 2012 surgery, [Robinson] failed to remove the catheter fully intact and/or broke the catheter during removal, and/or failed to fully inspect the catheter after removal to ensure that it had been entirely removed from [Smith's] chest intact and in its entirety."  "As a result, a foreign object was left within [Smith's] body (a broken section of the catheter) which served no therapeutic purpose.  [Smith] was discharged with the object in her body, and was not informed of its presence."

The complaint alleged that in December 2015, Smith experienced severe chest pain.  On December 21, 2015, Smith believed she was having a heart attack and sought emergency treatment at Mercy Medical Center.  A CT scan of Smith's chest was performed.  It "revealed the presence of a curled and/or coiled section of catheter located in her right pulmonary artery, where it had come to rest after passing through her heart."  More specifically, the CT scan findings were:  "There is a piece of a catheter, which is coiled backwards upon itself, and both portions of this catheter are lodged within the

2.

main pulmonary artery extending into the right central pulmonary artery." "This diagnosis and condition was confirmed during a second CT scan which took place on September 30, 2016." More specifically, the subsequent CT scan report stated: "There is a piece of a catheter which apparently has broken off and embolized into the main pulmonary artery extending into the right central pulmonary artery."

The complaint further alleged: "The foreign body [left in Smith's body] directly and proximately caused [her] substantial injury, pain, suffering, and attendant damages." Smith made multiple emergency room and hospital visits and underwent various scans and imaging procedures. Removal of the catheter segment would entail additional surgery, among other treatments.

As mentioned, the complaint asserted a medical negligence cause of action. With regard to this claim, the complaint alleged: "[Robinson] owed [Smith] the obligation to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful practitioners would use in the same or similar circumstances. This includes but is not limited to performing surgery in a professional and safe manner, keeping track of all objects going into and out of [the] patient's body, not leaving foreign objects in the patient's body, and timely detecting and correcting complications arising from failures in the foregoing." The complaint added: "[Robinson] breached the standard of care by, *inter alia*, breaking the catheter during removal, leaving a foreign object in [Smith's] body in connection with the subject surgery, and failing to adequately inspect the catheter upon removal from [Smith's] chest to ensure that it had been removed intact, complete and unbroken, causing injury to [Smith] in the surgery by performing below the standard of care." Finally, the complaint stated: "As a direct and proximate result of the foregoing, [Smith] suffered severe injury and is entitled to recover … damages in an amount according to proof at trial."

The complaint also asserted a general negligence/res ipsa loquitur claim against Robinson. In this regard, the complaint alleged: "[Robinson] breached the duty of care

3.

owed to [Smith] by, *inter alia*, leaving a foreign object in [Smith's] body in connection with the subject surgery, and by causing injury to [her] in the surgery by performing below the standard of care." The complaint added: "Further, [Smith] alleges that the harm and injury sustained by [her] herein would not normally occur unless someone had been negligent. At the time [Smith] was injured, [she] was under the care and control of [Robinson].… [Smith] further alleges that she did nothing to contribute to … the acts or omissions that caused her harm." The complaint added that Robinson's negligence "constitutes a substantial factor in causing the harm suffered by [Smith]." The complaint further noted: "As a direct and proximate result of the foregoing, [Smith] suffered severe injury and is entitled to recover … damages in an amount according to proof at trial."[1]

## B.     Deposition of Dr. Richard Robinson

In December 2019, Robinson was deposed in this matter. We will summarize his deposition testimony. Robinson was a general surgeon; by October 2019, he was no longer practicing. Robinson implanted a "port-a-cath" device in Smith's chest. A port-a-cath device consists of two parts: a port part and a catheter part. Robinson was asked: "Have you ever reviewed any films of Budina Smith as to the issue of a port or catheter?" Robinson responded: "The first X-ray I reviewed concerning the port and catheter placement was [immediately] after its implantation in January of 2011." Robinson continued: "After this case was filed, I reviewed a chest X-ray that had been done from an emergency room here in town, which I believe is the first time that there appeared to be a fragment of the catheter still inside Mrs. Smith."

Robinson confirmed he implanted the port-a-cath in Smith's subclavian vein on the left side of her chest; the subclavian vein is a large vein underneath the collar bone. As for the catheter's end point, he stated: "The catheter ideally is going to sit in the

---

[1] The complaint also contained claims against the manufacturer of the subclavian chemo port device. However, those claims were resolved and are not at issue in this appeal.

4.

superior vena cava essentially just above the heart where its tip is infusing whatever solution is passed though the reservoir directly into the right side of the heart."

Robinson described the primary benefits of the port-o-cath device: "The device allows access to the central venous system, a very large vein [i.e., the superior vena cava], which therefore allows those solutions to be introduced at a faster rate because the dilution is very rapid and [any causticity of the solution] doesn't damage the vein." Robinson added that the device also benefits patients in terms of "not having to have procedures at the time of treatment for starting an IV, poking and poking." He added: "[W]hat in effect, happens, is that the port provides a fast, safe pathway to the superior vena cava at the junction where it meets the heart." In Smith's case, she was referred for a port-a-cath by her hematologist, as she needed iron infusions for chronic anemia.

Robinson addressed the process by which he implants a port-a-cath in a patient. Although not entirely clear, the testimony indicated that at the very beginning of the process, an incision is made under the collarbone (superior or upper incision), the subclavian vein is accessed with a needle, and a dilator is placed therein to stretch the blood vessel; a sheath and guidewire are also placed at that site, to be used later to guide the catheter into the superior vena cava. Three to ten centimeters *below* the superior incision, another incision is made on the side of the chest (inferior or lower incision), for placement of a pocket to hold the port reservoir.

One end of the catheter is then attached to a "tunneler." Starting from the lower incision, the catheter is then tunneled or pushed through the chest tissue to, and out, the upper incision. In other words, the two incisions or "open" areas are connected by the catheter. Robinson noted that both ends of the catheter end up getting trimmed in the process. After the catheter is tunneled from the lower incision to the upper incision, Robinson initially trims its lower or proximal end, which is thereafter attached to the port reservoir. The port reservoir is then placed in the pocket, implanted, and sutured into place. The segment of catheter that is "coming through the skin" at the site of the upper

5.

incision is then "placed on [the outside of] the chest wall to get an idea of how much more needs to be trimmed if any," to ensure the upper or distal end can be placed in the superior vena cava. The catheter has lines every five centimeters along its length for measuring purposes. The length of catheter placed in the patient ranges from "probably between ten and 20 to 25 centimeters."

Robinson was asked, with regard to his preoperative discussion with Smith: "Did you discuss the risk of positioning of the catheter as it relates to where the catheter would pass between the clavicle and first rib, the concept of what's known as pinch-off?" Robinson responded, "No." Robinson responded in the affirmative when asked whether he was "familiar with pinch-off." He described pinch-off: "Well, it's where the catheter passes through the subclavian vein but is essentially pinched by the rib and [clavicle] so that it tends to be essentially kinked." Robinson confirmed he was familiar with this potential complication when he implanted the port-a-cath in Smith's chest.

Robinson clarified that he inserts the catheter medially (i.e., closer to the sternum). Robinson noted the collarbone or clavicle goes from the shoulder to the sternum at the first rib. When Robinson stated he aims to insert the catheter medially, he meant he aims to insert it towards the center of the body. He stated that over the years, he moved more and more "medial" or more and more towards the center of the chest, in terms of the point where he accessed the subclavian vein. He testified: "Over the years, on the left side access, I have come more medial for … that initial needle under the collarbone [i.e., he inserts the needle closer to the sternum]." He added: "I used to go at about the halfway point of the clavicle of the collarbone[,] where I would make the needle stick and maybe two centimeters below the inferior or lower border of the collarbone. Now I go about one-third of the distance between the medial tip of the collarbone and its distal end, so I'm much closer [to the sternum]."

Robinson summed up his placement technique: "I would go approximately one-third of the distance between – from that point at the middle of the chest outward toward

6.

the shoulder, so about one-third of that distance to the side, in this case the left side. I would then go below the palpable lower border of the collarbone for about two to three centimeters, and that's the site I would use for the needle stick to access the subclavian vein." Robinson confirmed he followed this pattern with Smith. He added: "The reason I do it that way is it works."

Robinson described his typical post-operative process. After he finishes up with implanting the port-a-cath, the patient is sent for an x-ray. Robinson reviews the x-ray. Robinson testified: "What I'm looking for is the catheter placement to see that it's in the appropriate position. I'm looking to see if there's any evidence from [the] X-ray of complications from the procedure … say, fluid collecting inside the chest wall outside the lung which might indicate bleeding." With regard to catheter placement, the only thing Robinson looks for is whether the distal tip of the catheter is within the superior vena cava.

Robinson was then further questioned about pinch-off. Robinson agreed that pinch-off would occur if the catheter was in a position where it could be pinched at the junction of the clavicle and the first rib. When asked whether an X-ray would reveal the existence of pinch-off, Robinson answered, "Unlikely." Pinch-off results in compression of the catheter "so that it's more difficult to flush or to utilize[,] or it flows slower." Less often, pinch-off results in a segment of the catheter breaking open or breaking off. Robinson generally does not observe pinch-off in the X-rays taken after the implantation procedure. With regard to the possibility that Smith suffered pinch-off, Robinson stated: "So she could have had a pinch-off when she was sitting up, and I could have missed it or just not seen it [on the X-ray]. It's certainly possible, but I don't know."

Robinson testified that he was adequately aware of the risks and benefits of the port at the time he implanted it in Smith, both from the medical literature and the instructions for use that accompanied the device. He had reviewed the instructions for use that came with the device. He confirmed that the instructions for use accurately

explained the risks and benefits of the device and fairly and accurately addressed the proper technique for implanting the device.

With regard to Smith's recovery, Robinson noted: "I saw her three days after surgery, on January 7th of 2011, and she was complaining of severe pain at the site of the reservoir (i.e., the pocket)." He added: "I saw her again five days later on January 12th of 2011, and at that point my note says she was still with pain and normal exam." She subsequently improved and did not require further follow-up.

Robinson was next questioned about the port-a-cath's functioning, as reflected in Smith's hematologist's records. At one point, an attempt was made to flush her port with normal saline, but she complained of severe pain above the port, at the site where the catheter is tunneled under the skin. At another point, her hematologist was unable to obtain blood flow through the port. Robinson stated: "[This] would seem to indicate that the catheter or reservoir or both are occluded." He added it could also mean the catheter was no longer in the subclavian vein. Robinson also heard from Smith that her hematologist was not accessing the port for her treatment, from which he gathered the apparatus was likely occluded. At some point Smith went for an ultrasound, which confirmed that the device was occluded. Declotting was attempted but failed. Meanwhile, Smith continued to complain of severe pain at the site above the port. At that point, Smith's hematologist referred her back to Robinson for removal of the port-a-cath device. The removal surgery took place on April 9, 2012.

With respect to the removal surgery, Robinson stated: "The catheter has been walled off essentially by the body, so there's not going to be, on removal, leakage of blood from the vein into the tissues, and what apparently happened to [Smith] was a portion of the catheter can break off on removal, and that situation, in my experience, you know it at the time." Robinson continued: "I've had a couple actually at the surgery center where it was obvious that there was a problem in removing the catheter or the catheter was incomplete on removal and therefore chest X-ray was done following the

8.

removal and the patient was referred to have the [severed] catheter portion removed from their heart. [¶] I've had occasion to do that, but on both of those occasions, there was [an] indication at the time of removal that a problem existed."

Robinson's report regarding Smith's port-a-cath removal surgery stated that the catheter's tip was "clean." Robinson testified: "Generally, when I say the tip is clean, what that means is I've inspected the tip of the catheter and it appears to be a cut end, implying that it's not been broken." His report also noted that the catheter appeared to be the appropriate length. Robinson was asked whether he recorded that observation because going into the procedure, he was concerned the catheter might have been broken. Robinson responded: "I always inspect the catheter and the reservoir once I remove it to see if it's an appropriate length. I mean, we don't have a length measurement, but to see if it's appropriate and to check the ends of the catheter to see if it's a clean cut rather than a fracture." Robinson was asked: "And you do that because you're aware it that it can fracture?" He answered, "Yes."

Robinson continued: "The other indication that you may have a problem with the catheter fracturing is difficulty in removal of the catheter itself once the reservoir has been taken out of its pocket[,] pulling on that catheter to bring it back out of its sheath in the vein. If there's resistance and significant resistance, it then gives way, that alone, even if the length is okay and the tip looks okay, is an indication that maybe part of that is broken off during removal." Robinson said that even when the catheter's tip looks ok, it was still possible that it had actually fractured, as catheters do not always break irregularly.

Robinson confirmed that he did not measure the length of the catheter at the time of implantation. After removal, he sent the device components to the pathology department. The pathology department recorded that the chemo port removed from Smith's chest consisted of a "12.3 centimeter portion of plastic tubing." Robinson was asked: "So given that it wasn't measured when it was implanted, you don't know

9.

whether or not that 12.3 centimeter [portion] represents the entirety of the catheter that you implanted in Mrs. Smith?" Robinson responded: "That's correct." Robinson also confirmed that no x-rays or scans were done immediately following removal.

Finally, Robinson was asked: "Did you have any reason to disagree with the conclusions related to [the] scan [done in December 2015 when Smith sought emergency treatment,] that there was a piece of catheter which had apparently embolized into her pulmonary artery?" Robinson replied: "I concur with the interpretation that this is in fact a portion of the catheter of this chemo port that is now lodged in the wall of her pulmonary artery."

## C. Dr. Robinson's Motion for Summary Judgment

On February 6, 2020, Robinson filed a motion for summary judgment. Robinson's motion summarized the basic facts as follows:

> "On or about January 4, 2011, [Smith] was referred to Dr. Robinson by her primary treating physician for surgical implant of a chemo port catheter into her chest to allow for intravenous iron infusions to treat her chronic anemia. The procedure was completed without complication.

> "On April 9, 2012 [Smith] was referred back to Dr. Robinson for removal of the chemo port catheter. The procedure was completed without any known complications.

> "A December 21, 2015 CT scan of [Smith's] chest revealed the presence of a coiled segment of catheter located in her right pulmonary artery. A second CT scan, performed on September 30, 2016, confirmed this diagnosis." (Capitalization omitted.)

In support of his motion, Robinson submitted a declaration from an expert witness, Dr. James R. Macho. Robinson contended in his summary judgment motion: "[C]ompetent expert testimony from James R. Macho, M.D., a general surgeon, establishes that Dr. Robinson met the applicable standard of care while rendering treatment to [Smith] on April 9, 2012 and that nothing Dr. Robinson did or did not do caused or contributed to any of [Smith's] claimed injuries." Robinson argued in the

10.

motion: "[Smith's] causes of action for medical negligence and general negligence/res ipsa loquitur fail as a matter of law because Dr. Robinson did not breach the standard of care or cause the alleged harm." (Capitalization and italics omitted.)

The declaration of Dr. Macho (defendant's expert witness) set forth a number of "conclusions and opinions," which were "expressed to a reasonable degree of medical probability":

> "a)     To address Ms. Smith's need for intravenous iron infusions to treat her chronic anemia, it was appropriate and within the standard of care for Dr. Robinson to implant the chemo port catheter based on the recommendation of Ms. Smith's primary treating physician. In addition, Dr. Robinson's technical performance of the procedure was appropriate and within the standard of care, as Dr. Robinson used the correct technique and equipment. In addition, the operative note is sufficiently detailed in describing the catheter's placement. Importantly, the standard of care does not require measuring the length of the catheter placed in the patient or documenting the length in the patient's chart.

> "b)     The decision to remove the chemo port catheter was made by Ms. Smith's primary treating physician due to the ultrasound findings that the catheter was occluded. Dr. Robinson's technical performance of the procedure was appropriate and within the standard of care, as Dr. Robinson used the correct technique and equipment. The operative note [was] also sufficiently detailed in describing the procedure and the technique used. Importantly, the standard of care does not require that a physician measure the length of catheter that is removed. Furthermore, since the standard of care does not require the length of the catheter to be measured at the time of implant, knowledge of the specific length of the catheter at the time of removal would not provide insight as to whether the entire length of catheter had been removed.

> "c)     Dr. Robinson's failure to appreciate or suspect that a segment of catheter may have been retained was not a breach in the standard of care, given the evidence in this case. First, Dr. Robinson testified the catheter was easily removed. This is significant as difficulty removing a catheter may raise concern that a segment could break off. Second, Dr. Robinson testified that after removing the catheter, he observed it and noted the end was smooth and did not appear to have been torn or fractured. Dr. Robinson further testified that the length of the catheter was within a range that did not cause him to suspect that it was not the full length that

11.

had been inserted. The foregoing observations are important, as they would not have caused a reasonable physician to suspect that he/she had failed to remove the entire catheter. In addition, it is not established that the section of the catheter broke off at the time of removal. It is entirely possible that the catheter may have fractured due to prolonged mechanical shearing forces acting on the catheter over the time of implantation. This is more common with catheters inserted via the infraclavicular approach. Finally, the ultimate fact that a segment of catheter was retained in Ms. Smith is not, in and of itself, a breach of the standard of care, as it is a recognized risk of the procedure which can result even in the absence of any negligence or breach of care. The reported rate of intravenous catheter fracture is approximately 0.1%.

"d)     The retained catheter was incidentally discovered on a chest CT on December 21, 2015. In comparison to a chest x-ray from February 26, 2013, it was in the identical position, curled up at the exit of the pulmonary artery. Accordingly, the imaging evidences that the catheter had remained in the same location for almost three years. This is significant because when a segment of catheter has been retained for a long period of time, the body will typically contain or 'incorporate' it, and the catheter will not be exposed within the lumen of the vessel. Based on the length of time the catheter has remained stationary in Ms. Smith, it is my expert opinion, to a reasonable degree of medical probability, that the segment of catheter has been incorporated and epithelialized. From my review of Ms. Smith's medical records in this case, I note that this opinion is shared by her treating physicians. Importantly, once a foreign object, such as a segment of catheter, has been incorporated and epithelialized, it rarely poses any risk of injury to the patient.

"e)     Although initially there are potential complications of retained catheters, such as necrosis, occlusion and perforation, none of these complications have occurred during the 7 years that the catheter segment has been present in this patient. If any of the forgoing complications were going to arise, I would have expected them to occur in the weeks and months following the event that resulted in the retained catheter. Accordingly, since Ms. Smith has not experienced any complications in the past 7 years, to a reasonable degree of medical probability, Ms. Smith will not experience any complications due to the retained segment of catheter in the future.

"f)     Although Ms. Smith has expressed subjective complaints to her medical providers that the retained segment of catheter occasionally causes her pain, this complaint lacks physiological basis. Catheters and

pacemakers are routinely implanted in the heart and vessels. They do not cause pain because of the lack of pain receptors in those locations. Since the segment of catheter is looped and incorporated in Ms. Smith's pulmonary artery, it is, therefore, physiologically impossible for Ms. Smith to feel it or for it to cause her pain. Nevertheless, Ms. Smith's medical records reflect that she underwent an extensive workup due to her complaints of chest pain and that her cardiac evaluation was stellar: she had a normal echocardiogram, normal ejection fraction, and normal stress test, which was actually quite surprising and reassuring, considering her other health problems. Accordingly, all of the available evidence supports the conclusion that the catheter is not adversely affecting her cardiac function.

"g) The overwhelming evidence suggests that no harm was done to Ms. Smith by this retained segment of catheter. It has become a benign entity that does not require any intervention, and to a reasonable degree of medical probability, does not pose any risk of injury to Ms. Smith's heart, great vessels or any other part of her body, in the future."

### D. Smith's Opposition to Robinson's Motion for Summary Judgment

On April 13, 2020, Smith filed an opposition to Robinson's motion for summary judgment. Smith's opposition noted:

"In this case Plaintiff Budina Smith contends that Defendant was negligent in his treatment of her and that he breached the standard of care in at least five separate ways.

"1. Defendant failed to follow the manufacturer's instructions relative to the specific catheter insertion point when implanting her chest port catheter on January 4, 2011, resulting in catheter 'pinch off' or severing;

"2. Defendant failed to follow the manufacturer's instructions by not measuring the length of the catheter he implanted into Plaintiff's chest after trimming both ends of the catheter on January 4, 2011[,] meaning that upon removal there was no way for him to know whether the entire catheter had been removed;

"3. Defendant failed to heed the manufacturer instructions in March 2012 regarding Plaintiff's symptoms of a non-functioning chest port catheter and chest pain indicating that part of the catheter had been severed and remained inside Plaintiff's body;

13.

"4.    Defendant failed to take an x-ray image of Plaintiff's chest on April [9], 2012 immediately following the removal of the chest port catheter to ensure that the entire catheter had been removed, despite having x-ray equipment readily available; and

"5.    By leaving a section of the catheter inside her body, where it traveled through her heart, coiled up, and became lodged in her right pulmonary artery, where it remains to this day, like a ticking time bomb inside Plaintiff's chest."

Smith's opposition further stated:  "Defendant admitted during his deposition in December 2019 that the section of catheter lodged in Plaintiff's right pulmonary artery is indeed part of the chest port catheter he had previously implanted in Plaintiff's chest. Defendant also [effectively] admitted during his deposition that he deviated significantly from the Instructions for Use from the catheter's manufacturer during implantation, instructions that were designed specifically to prevent the same kind of 'pinch-off' fracture as happened in this case.  Defendant did exactly the opposite of what those Instructions for Use provided for and the catheter was indeed 'pinched off' and severed as a direct and proximate result of Dr. Robinson's negligent failure to adhere to those instructions."

Smith's opposition continued:  "This 'pinched off' section of catheter broke free and traveled down Plaintiff's subclavian vein in her chest, into and through her heart, and came to rest, coiled up in her right pulmonary artery where it remains lodged today.  This circumstance is visible on multiple x-ray films taken since December 2015[,] when it was first discovered after Plaintiff presented to an Emergency Room with chest pains."

Smith's opposition noted:  "Defendant's failure to adhere to the Instructions for Use from the manufacturer during implantation is what caused the catheter to fracture and sever in the first place.  [However,] neither Defendant's motion nor the declaration of Defendant's expert address the issue of causation in this case."

Smith's opposition contended:  "Prior to filing his Motion for Summary Judgment, neither Defendant nor his counsel realized that the procedure Defendant performed on

14.

Plaintiff in implanting the catheter port directly contradicted the instructions provided. Those instructions were designed specifically to prevent catheter pinch off, or severing. This isn't even addressed in Defendant's motion. For that reason alone, as a matter of law, Defendant's motion has to be denied."

Smith's opposition concluded: "Because a section of the catheter remains lodged inside Plaintiff's chest, Plaintiff does not believe she even needs expert witness testimony in this case but retained an expert anyway in an abundance of caution[.]"

In support of her motion, Smith submitted a declaration from Dr. Gary Hoffman, a Cedars Sinai surgeon and Smith's expert witness regarding the standard of care, breach thereof, and causation. Hoffman had "extensive experience as it relates to the surgical implantation and explantation of chest port catheters."

Hoffman declared:

"[I]t is my opinion that Dr. Robinson's actions fell below the standard of care, at a minimum, during the implantation of Plaintiff's chest port catheter on January 4, 2011, when he failed to measure the length of catheter he implanted into Plaintiff's subclavian vein after he trimmed both ends of the catheter tube. Failing to measure the length of the catheter tube at the time of implantation and failure to document the length of catheter tubing implanted made it impossible for anyone, including Dr. Robinson, to accurately determine whether the complete catheter tube had been removed during the explantation surgery on April 9, 2012, other than by visual means which in this case proved to be incorrect. [The Instructions for Use for the relevant device], within the section entitled 'Implantation Preparation,' reads as follows, 'Complete the patient implant record, including the length of catheter implanted, product number and lot number.' [Citation.] Dr. Robinson did not follow this instruction. Exhibit 3 to the deposition of Dr. Robinson is that part of his operative report which contains a sticker provided by the manufacturer for the purpose of recording this information. The sticker is designed to be adhered to the operative record. On the sticker appears the lot number and the product number, but no record of the length of the catheter implanted. [Citation.] In this respect I disagree with the opinion of Dr. Robinson's expert witness Dr. James R. Macho.

15.

"In fact, on April 9, 2012[,] Dr. Robinson did not remove the entire length of catheter tubing he had previously implanted in Plaintiff's chest. Because he did not measure the catheter tubing at implantation, there is no way he could have known if he had removed it in its entirety during explantation. He left a section of that catheter tubing inside of Plaintiff (which he readily acknowledged during his deposition testimony) where it traveled down her superior vena cava, through her heart, eventually coming to rest in her right pulmonary artery. The stark reality of this case is that if Dr. Robinson had measured the length of catheter he implanted in Plaintiff's chest at the time he implanted it, this case never would have been filed because Dr. Robinson would have subsequently known at explantation that he had not removed the entire length of catheter tubing. He then very likely would have proceeded accordingly based on that information and removed the section of tubing remaining in Plaintiff's right pulmonary artery.

"It is my further opinion that it falls below the standard of care virtually any time a surgeon leaves part of a medical device inside a patient's body following a surgical procedure intended to remove the entire medical device, as Dr. Robinson did in this case. In this respect I also disagree with the opinion of Dr. Robinson's expert witness Dr. James Macho.

"The Instructions for Use relative to the … chest port catheter that Dr. Robinson implanted, and then subsequently removed from Plaintiff's superior vena cava, which instructions Dr. Robinson testified at his deposition he was familiar with and had read and believed to be accurate, speak conclusively to a specific location along the subclavian vein where the catheter should be inserted. These catheters are extremely flexible, some might say flimsy, and can kink or break. This is why the Instructions for Use indicate that insertion into the subclavian vein should be made laterally (closer to the shoulder along the collar bone), rather than medially (closer to the sternum along the collar bone). The Instructions for Use provide this direction specifically to prevent catheter fracture, or severing of the catheter due to compression between the collar bone and the first rib at the top of the rib cage. Dr. Robinson did not adhere to this instruction when implanting Plaintiff's chest port catheter on January 4, 2011 and it is more likely than not that this was the cause of the catheter fracture in this case, causing the catheter to sever into two pieces while still inside Plaintiff's chest. Significantly, neither Dr. Robinson's Motion for Summary Judgment nor Dr, Macho's declaration address this issue of inserting the catheter medially versus laterally or whether the catheter placement in this case was the cause of the catheter fracture that occurred.

"I further disagree with Dr. Robinson's expert witness[,] Dr Macho[,] when he essentially describes a section of catheter tubing coiled up and lodged inside Plaintiff's right pulmonary artery as a benign 'no harm, no foul' situation that caused Plaintiff no injury. I also disagree with Dr. Macho when he states that the section of catheter has likely been 'incorporated' into Plaintiff's pulmonary artery. The implication is that if something has become 'incorporated' into an artery wall then it has become immovable and its position is permanently fixed. A section of catheter such as the one at issue in this case may simply be too big to become incorporated into an artery wall. It's just highly improbable that this length could incorporate into the wall of the pulmonary artery and be covered by benign scar tissue, which would prevent a pulmonary embolism. The implication of this is that the section of catheter tubing is NOT therefore immovable and its position is NOT permanently fixed. This circumstance, by definition, means that this may not be an entirely harmless situation.

"I offer no opinion as to what Plaintiff should do, whether she should leave the section of catheter where it is and hope for the best, or whether she should explore having the section of catheter surgically removed. But it is certainly a possibility that the section of catheter could become dislodged and migrate distally with potentially grave consequences. If she were to explore surgical removal of the section of catheter she has two likely options of accomplishing that: a sternotomy or cardiac catherization. A sternotomy involves opening or splitting the sternum similar to an open heart surgical procedure, resulting in significant post-operative pain, a long recuperative period and leaving a lengthy and very noticeable vertical scar along the patient's torso and chest. A cardiac catherization procedure involves threading a flexible catheter into a blood vessel in the patient's groin up the body to the pulmonary artery. One potential risk with this procedure is tearing or perforating the wall of the patient's pulmonary artery, a potentially fatal consequence. Given these choices, it is fair to say that no reasonable person would choose to live their life with a foreign body lodged in or partially blocking their pulmonary artery, with the potential of pulmonary thrombus, pulmonary scarring, and/or cardiac dysfunction."

## D.     Outcome of Robinson's Summary Judgment Motion

On April 15, 2020—two days after Smith submitted her opposition to Robinson's motion for summary judgment along with Hoffman's supporting declaration—Robinson filed a short notice withdrawing his motion for summary judgment. Smith notes in her opening brief that Robinson withdrew his summary judgment motion in light of Smith's

opposition and Hoffman's supporting declaration. Smith further notes that Robinson did not file any subsequent summary judgment motion ahead of the February 2023 trial date. Robinson does not dispute these observations.

**E.      Deposition of Dr. Gary Hoffman**

Smith's expert witness, Dr. Gary Hoffman, was deposed on November 16, 2021.

Towards the beginning of his deposition, Hoffman was asked whether he wanted to update or clarify anything he had stated in his prior declaration. Hoffman stated that, at this point, the only way the piece of catheter residing in Smith's right pulmonary artery could be removed would be by an open procedure or sternotomy (the cardiac catherization, using interventional radiology, discussed in his declaration was no longer a feasible option). Furthermore, even an open procedure would entail "the risk of surgery in general; bleeding, infection, death, cardiovascular [and] neurological sequelae." Since the pulmonary artery is a very thin-walled artery, taking the catheter fragment out would expose Smith to "major risks," such as "the risk of bleeding or of losing part of her lung because you have to clamp and cut the artery itself[.]" On the other hand, by leaving the catheter in the pulmonary artery, Smith ran "the risk of pulmonary hypertension, [and] a less likely [outcome] that it would dislodge and move further." Hoffman emphasized Smith was between a rock and a hard place. He would advise her to "consider just living with it." Hoffman pointed out: "*And of course then she's going to have to live with the psychological aspects of living with it and what's going to happen down the road*. But that's another risk. But that's manageable." (Italics added.)

Hoffman was asked what the primary risks were in terms of future consequences, should Smith continue to live with the catheter inside her. Hoffman stated: "The risks can go all the way from no risk, and we don't know we're looking down the road, to developing pulmonary hypertension and cardiac failure as a result of that, inability to live a life that has any physical aspect to it because there – there are four grades of pulmonary hypertension, the worst being you can't even move because you have such severe cardiac

18.

dysfunction from the pulmonary hypertension, the least being pulmonary hypertension with no symptoms. So there's a scale of 1 to 4. We don't know where she'll be 10 years from now when her body is 10 years older." Hoffman added: "But she's got a risk factor already. She essentially has a catheter there, which is a risk factor for pulmonary hypertension, but we don't know what the status is of the pulmonary artery. These things can be two centimeters wide. They can be a centimeter in diameter. And when you have scar and a catheter there, we don't know that the whole lumen is not about to occlude. So we just don't know." As for the risk that the catheter piece would migrate, Hoffman observed: "[T]his thing has lodged as far as it's going to go, and I don't think it'll travel downstream."

Hoffman was asked: "Can you say to a reasonable degree of medical probability that her risk of contracting pulmonary hypertension is increased with the presence of the catheter there than it would be if the catheter wasn't there." Hoffman answered: "Absolutely, yes." Hoffman continued: "What I'm telling you is we can tell you pulmonary hypertension 1, 2, 3, or 4, the catheter is a risk. We may not know why. It's obvious it's flapping around and creates problems. But the part about – even if it's epithelialized, it's more toward the size of the lumen – lumen means opening – the size of the lumen through which her blood is flowing. And just having an obstruct[ion]— remember, this catheter went in, and it doubled back on itself. And if that whole thing starts to scar in, she may already have pulmonary hypertension. [¶] And pulmonary hypertension Stage 1 is you have no knowledge that you have it basically. [¶] Stage 2, you start to feel it a little bit tired on – on exertion. It goes all the way up to Stage 4. [¶] We don't know if she doesn't – she may already have pulmonary hypertension."

Hoffman said that the uncertainty "is something [Smith] is going to have to live with." As to the likelihood of Smith getting pulmonary hypertension in the future, Hoffman noted that he could not "speak to causation because it hasn't happened yet." Hoffman confirmed that, with respect to the likelihood of Smith developing pulmonary

19.

hypertension specifically, he could not state that it was a medical probability she would develop this condition as a result of the retained, severed catheter. However, Hoffman also stated that were Smith to get pulmonary hypertension, more probably than not it would be on account of the severed catheter in her pulmonary artery.

Regarding the position of the catheter, Hoffman stated: "I don't know how it bent backwards on itself … My guess would be that it stopped where it did because it could not go any further. And especially when it bent in half, it stopped … at a point closer to the heart, meaning it obstructed an even bigger segment of the pulmonary artery. And I believe it obstructed right at the take-off from the main pulmonary artery to the right pulmonary artery. That's a huge artery. That's a big deal." Hoffman continued: "And, in fact, if I read the report, or the picture right, part of it may … actually be in the main pulmonary artery. If that's the case, it's a setup for even more possibility of having a clot because now you have a free end that can't epithelialize kind of waving in the breeze with blood flowing … by it. So it stopped because it couldn't go any further, and it stopped at a pretty significant spot."

Hoffman was asked what the purpose was of the right pulmonary artery relative to the right lung. Hoffman noted: "[T]he right branch of the – off of the main pulmonary artery provides the blood flow that goes to that lung. There are other sources, but this is the oxygenated blood that gets to the lung, and it's right at the take-off of the right side." Hoffman further explained: "You want to reoxygenate the deoxygenated blood. And as the vessels get smaller and smaller, they're actually able to come in contact with the fresh air that you breathe in, exchange oxygen across the capillaries, and then they go back out to the pulmonary vein, and they get bigger and bigger and bigger. And you're significantly decreasing the blood flow [due to the presence of the severed catheter]." Hoffman concluded: "I would bet you, if I had to guess, bet, her blood flow is decreased to the right pulmonary artery. And I can answer that more probably than not [that is the case]."

Hoffman had implanted hundreds of port-a-cath devices and removed approximately half of those implanted. Hoffman testified he had never had the experience where a catheter fractured when he was removing it. He added: "I [also] personally have not ever had [it] happen, where the removal of the catheter was incomplete, no matter when the fracture occurred. I have not had that experience."

Hoffman was asked, with respect to the insertion of the catheter by Robinson, whether Robinson had performed in a way that a reasonable surgeon would not have. Hoffman answered: "I think I can … just simply say that it was placed too medially and as a result fractured. And the fracture was the result of the location and – location of the placement of the catheter." Hoffman continued: "I'm intimately involved in the teaching at Cedars [Sinai] and we no longer place [catheters] the way Dr. Robinson did it. So I would have a criticism that it was placed too medially. It works, and more often than not you get away with it, but when you don't you don't, and that's why we don't do it that way anymore." It was not appropriate when Robinson implanted the catheter in Smith in October 2011, to have placed it as medially as he did. Hoffman concluded: "I would not have let Dr. Robinson place the catheter the way he did had he been under my teaching at Cedars [Sinai]. Or anywhere actually. It doesn't matter whether it's Cedars or a small hospital."

When asked what the risk or danger to the patient is, that would make Robinson's method an unreasonable practice in 2011, Hoffman testified: "Well, just what we saw, which is the catheter fractured because of the costoclavicular pressure on it. We don't know exactly when it fractured, but I suspect it fractured – prior to him removing the catheter it had already fractured. And that's why I wanted to be specific. I don't have any problem with the way he pulled it out. It was probably already fractured." Hoffman continued: "So back in 2011, had he and I been in the operating room with [Smith] … [I] would have [had him take] a little marking pen and X'd the point and showed me where he was going to put it and I'd say no, that's too medial. And he might have said, well,

21.

why. And I would have said, go look at your anatomy, look at how these things are affected … by where they're being put in and draw me another point on the body, because that's where it's got to go." Port-a-caths are not inserted medially because of the incidence of "pinch syndrome." Hoffman opined, that given the catheter in this instance was placed too medially, it was more probable than not it fractured on account of costoclavicular pressure at the insertion site.

Hoffman was asked: "What else, if anything, regarding the insertion of the catheter do you feel was below [the] standard of care besides that it was placed too medially?" Hoffman answered: "Well, again, this gets into the standard of care. I measure the length of what I put in. It's part of the record. So I know when I take it out, how much I've got. [¶] And now we're heading toward the removal part and his thought process then."

Hoffman and Robinson's counsel had the following exchange:

"Q. Right. And I know from your Declaration you indicated that you, on the little thing that they give you that identifies the product, there's a space to identify the length, and then that would be documented in the record.

"A. Right. That's correct.

"Q. That's something you do in your practice?

"A. That's – well, everybody I know who does these does that.

"Q. Well, that was going to be my question that – is it your experience that universally surgeons will actually write on there the length of a catheter in this type of situation?

"A. Whether it's written there – it'll be in my operative report. It may not be there, but it'll be in my op report for this very reason.

"Q. All right. And – and I don't mean to quibble with you, but you are chief of surgery at Cedars-Sinai and all, but you're not the standard. So I don't want to blend things into what you do or what you would aspire to or what is best practice or what you would teach. What I want to make sure I'm focusing on is whether it's your opinion that it was unreasonable, that

is below the standard of care[,] for any general surgeon not to make that recording somewhere in the record of the length?

"A. With respect to Cedars, had this type of case come up, it would have been presented at a morbidity/mortality conference. It hasn't come up in a while. [¶] Yes, it's not reasonable. And I guess we're into the withdrawal phase now. But how can you know what you took out when you don't know how long it was what you put in? So it's a comparison. And I think it's below the standard of care, absolutely.

"... [T]here are … some standard maneuvers we use to estimate how long we're going to make that catheter before we put it in. I think he did describe it. Put it on the chest wall, etcetera. And the last thing you do is measure it and you say, I'm putting in, you know, 22 centimeters of catheter."

Hoffman next addressed the "withdrawal phase." He said: "They pulled out 12.3 centimeters of catheter, okay. That's 4.8 inches. 4.8 inches to anybody who's put these in knows that's impossible to be the full length of a catheter. It's not possible. Therefore, his mouth should have gone dry and he should have thought, uh-oh, we have a problem. We don't have the full catheter." Hoffman explained: "You combine that with the fact they couldn't inject, and when they inject it hurt her, the first thought he should have had is, okay, it's implanted. It's still there. A chest x-ray would have confirmed that or some type of other study. But that didn't seem to happen in this case. [¶] But there's no way that anybody could have looked at 12.3 centimeters of catheter and said, I got it all out. It's not possible."

Hoffman further noted: "And – and I'll tell you one other reason why. When you put the port in on the chest, it's 12 centimeters probably just to get the port up to where it goes in the vein. You've got another 12 – 10, 12 centimeters to get down to the heart superior vena cava. So pulling out 12 centimeters barely even makes it into the vein. So he couldn't have removed the whole thing, and he should have known it back then." Not to have known this was "[a]bsolutely" below the standard of care. It was obvious that the segment that was removed was too short to have been the entire, implanted catheter.

23.

Usually, "the length of catheter from the … port side … to where to where it enters the vena cava [is] 11 inches, which is 25, 27 centimeters[.]"  A reasonable surgeon would have "run down to radiology really quickly, I'd call a cardiac surgeon really quickly and say, we got this problem."  The patient should be told the same day.  The patient would have had options.  "[S]omething could have been done."  In this case, "it wasn't discovered for several years later that it was still in there, so [Robinson] probably didn't know."

Hoffman stated:  "And as far as I understand, *we're here because there was an x-ray taken which showed a foreign body three years later, and that's why we're here*."  (Italics added.)  Hoffman said there were psychological repercussions but he was not asked to look at that aspect of the case.  Hoffman agreed that no one would voluntarily want to have something in them that was not supposed to be there.

Hoffman summed things up:  "I think the decision to put the catheter in was correct.  I think the decision to take it out was correct.  I think there was a technical mistake made during the insertion, which led to a fractured catheter.  I think that the potential for damage was compounded by not recognizing that not enough catheter was removed.  I don't have a criticism with the fact that he stopped at that point.  I have a criticism with the fact that … [h]e didn't recognize what had happened, so he didn't seek help or other advice."  Hoffman stated that when a catheter breaks, it could still have a smooth end.  "These things can fracture clean.  And that doesn't really tell you what you need to [know]."

Hoffman agreed that "you can have catheters that fracture that don't necessarily involve any breach."  However, he added:  "Dr. Robinson described the breach, so the logical conclusion is that's probably what caused the problem."

24.

## F.    Defendant's Motion in Limine No. 22 and Smith's Opposition

On January 20, 2023, on the eve of trial,[2] Robinson filed his motions in limine. Robinson's motion in limine No. 22 (motion in limine 22) is at issue on appeal.  Motion in limine 22 provided:  "Defendant [Robinson] seeks an order from this court precluding Plaintiff's retained expert, Gary Hoffman, M.D., from offering any medical causation opinions at trial, based on the fact that Dr. Hoffman testified at deposition that he could not state any of his causation opinions to a reasonable degree of medical probability and, in fact, 'can't speak to causation because it hasn't yet.' "  (Emphases omitted.)

Robinson's motion in limine further stated:

> "Medical malpractice, which has been alleged in Plaintiff's Complaint under the titles of 'Medical Negligence' and 'General Negligence/Res Ipsa Loquitur,' is a species of negligence.  In cases alleging medical negligence, the plaintiff must not only establish and prove that the defendant was negligent and that plaintiff was harmed, but must also prove that the defendant's alleged negligence was a substantial factor in causing the plaintiff's harm.  (*Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1093; See also, CACI, No. 400.)  Simply because a plaintiff may have been injured or is claiming some type of injury, harm, or damage, does not, by itself, mean that the named defendant was legally responsible for the harm.

> "The law is well settled that in a personal injury action[,] causation must be proven within a reasonable medical probability based [on] competent expert testimony.  Mere possibility alone is insufficient to establish a prima facie case[.]"  (Emphases omitted.)

Robinson's motion in limine 22 concluded:  "Dr. Hoffman's testimony unequivocally establishes his inability to provide any expert opinion on the issue of causation.  Dr. Hoffman should be precluded from offering any medical causation opinions at trial, as in his own words:  'I can't speak to causation.' "[3]  (Emphasis omitted.)

---

[2] Trial was set to commence on February 14, 2023.

[3] Smith's opposition to Robinson's motion in limine 22 is not in the record on appeal.

The trial court heard argument on Robinson's motion in limine 22 on January 30, 2023. The court ordered the parties to provide supplemental briefing on motion in limine 22 and set a further hearing on that motion on February 7, 2023.

The parties filed the supplemental briefing requested by the court. In her briefing, Smith argued, among other things, as follows: "Despite the fact that, as a direct result of Defendant's negligence, Plaintiff now has a section of catheter lodged in her right pulmonary artery, Defendant is claiming that Plaintiff suffered no injury and cannot establish that she suffered any injury because she cannot prove causation. There is no doubt that the negligent actions of Defendant caused all of this, it is painfully clear even to the most casual observer. The section of catheter *left inside Plaintiff's body* by Defendant as a direct result of his negligence is likely going to be there forever."

Smith added in her briefing: "Dr. Robinson's negligence, and the results of that negligence, have sidelined Plaintiff to some degree and have truly impacted her life significantly, through no fault of her own and has caused her tremendous stress, worry, anxiety, etc. The section of catheter *passed through Plaintiff's heart*. Removing it could kill her. Leaving it where it is increases her risk for innumerable ailments and conditions in the future."

Finally, Smith stated in her briefing: "Defendant Dr. Robinson breached the standard of care in any number of ways in this case. Each breach contributed to the end result: a pinched off, severed section of the port-a-cath catheter tube is now coiled up on itself and has embolized (lodged in and partially blocking) in the Plaintiff's right pulmonary artery. A surgeon [unintentionally] leaving a foreign object inside his patient is obvious negligence. Because Plaintiff lives everyday with the knowledge that this foreign object resides in a main artery and exists with the fear of the unknown that accompanies its existence and the unknown of whether or not she will eventually have to undergo surgery to have it removed, she is entitled to the maximum recovery under California law for her general damages."

On February 7, 2023, the court held a hearing on the issue of causation in the context of Smith's medical malpractice claims. Both parties presented argument at the hearing. Smith's attorney clarified that the injury at issue was the presence of the catheter segment *currently* lodged near her heart. He noted that Smith could testify to, and was entitled to, emotional distress damages arising from the fact that Robinson's breach of the standard of care had caused a segment of the catheter to be pinched off and left inside her body for the long haul. *He emphasized that Smith was not claiming damages based on any future injury requiring future medical treatment.*

Smith's attorney further noted: "If the Court is saying that [Dr. Hoffman] cannot testify as to causation of the event, itself, the Court is wrong to do so, because in the deposition of Dr. Hoffman, [he] stated that the medical negligence caused the catheter to be broken off inside of her. So insofar as the [elements of] duty[,] breach[,] causation[,] damages relating to the medical negligence, he certainly said the medical negligence caused the catheter to be broken inside of her."

As for Robinson's counsel, he argued: "[S]ome medical person has to say that this negligence that Dr. Robinson [allegedly] did, and not [the port-a-cath] manufacturer's negligence – but this negligence that Robinson did, which is disputed, but that that negligence caused some harm to the Plaintiff. And nobody has said that."

Robinson's counsel compared Smith's case to cases in which a plaintiff has *no current injury* but a potential exists for a future injury to develop. In this vein, Robinson's counsel contended: "In those cases, like the needle prick where somebody says, 'Well, now I'm going to get AIDS,' they don't get to testify themselves as a layperson, … even though they really may be afraid that they got AIDS from this one needle prick. No. There has to be a link, a medical link, that says it's probable that you may suffer some damage from that. [¶] And that goes along with HIV/AIDS." Counsel added: "[These cases] also talk about fear of cancer [from some toxic exposure]. It talks about these things where you can't just get up on the stand and say, 'Oh, I'm worried

about this,' without this causation link." Counsel posited: "So what we are laying before the Court is something that, as a matter of law, is a fatal flaw in their case that I think they've even admitted." Counsel went on: "And I think that justice requires not to waste the time of calling in a jury, empaneling them, making an opening statement, whatever. They can't make an offer of proof to you that can get them by this fatal legal flaw of causation."

The trial court granted Robinson's motion in limine 22, thereby excluding Dr. Hoffman's testimony as to any causation issues. The trial court also stated that it saw "a red flag that could be dispositive." At this juncture, Smith's counsel asked: "So when the Court is saying that [Dr. Hoffman] can't give any testimony on medical causation, is the Court saying that he can't say that there was a breach of the standard of care which caused the catheter to be left inside her body?"

Ruling from the bench, the court reiterated that it was precluding "Gary Hoffman, M.D., from offering any medical causation opinions at trial based on his specific testimony from his transcript, which said he cannot, with medical certainty, testify that Dr. Robinson caused any harm or injury to Plaintiff." Smith's counsel noted the court should consider the fact that "this is a res ipsa case," where specific testimony as to causation is not required. The court indicated it would entertain additional briefing as to whether or not its ruling on Robinson's motion in limine 22 disposed of the case altogether. The court set a briefing schedule for a dispositive motion from the defense; a hearing on the dispositive motion was set for February 14, 2023 (the day of trial).

In a subsequent minute order, the court adopted its prior tentative ruling granting Robinson's motion in limine 22 (the court's underlying tentative ruling does not appear to be in the record on appeal).

## G.      Defendant's Dispositive Motion in Limine and Smith's Opposition

On February 8, 2023, Robinson filed a "dispositive motion in limine following granting of motion in limine precluding medical causation opinions; motion for nonsuit"

28.

(dispositive motion or dispositive motion in limine), with a February 14, 2023, hearing date that coincided with the trial date.  (Capitalization omitted.)  Robinson argued in the dispositive motion:  "The Court has granted Defendant's Motion in Limine No. 22, to preclude Plaintiff's expert Gary Hoffman, M.D., from offering any causation opinions at trial.  Dr. Hoffman is the only expert, retained or non-retained, designated by Plaintiff.  As a consequence, Plaintiff is unable to present any expert testimony on the requisite issue of causation and so, cannot prevail on her claims of medical negligence and general negligence/res ipsa loquitur.  Therefore, Defendant now seeks a dispositive ruling of law, such as a judgment of nonsuit as to Plaintiff's Complaint and the two causes of action stated therein, to avoid unnecessarily impaneling a jury and [to] conserve judicial resources."  Robinson also argued that application of the doctrine of res ipsa loquitur was not factually warranted in this case.

Smith filed an opposition to Robinson's dispositive motion in limine, in which she challenged Robinson's motion on procedural and substantive grounds.  As to her procedural arguments, Smith stated, among other things:  "In a most unusual, and unprecedented, manner, the Court, just days before trial, and after granting a motion in limine concerning "Medical Causation" requested a dispositive briefing, in essence a summary judgment motion, providing Plaintiff less than 48 hours to respond.  Plaintiff has two causes of action, Medical Negligence and Res Ipsa Loquitur.  Sufficient evidence exists for Plaintiff to survive this dispositive motion and have a jury decide her case based on triable issues of material fact."  Smith added:  "Defendant has presented, and the court appears tempted by, a convoluted rhetorical shell game wherein the Defendants claim that, based on the Court's ruling on Motion in Limine 22, Plaintiff can't introduce medical expert testimony on 'medical causation' which this Court has stated is essential to prove Plaintiff's claims.  What Defendant attempts to accomplish is to have the court review the facts and law and decide there are not sufficient, admissible, disputed facts, to support Plaintiff's causes of action and Defendant is therefore entitled to judgment as a matter of

29.

law. This is the summary judgment standard." Smith continued: "This motion/process is defective and should be canceled, taken off calendar and/or denied."

Smith also made several substantive arguments as to why Robinson's dispositive motion had no merit and should be denied. Smith argued that Robinson seized on Hoffman's testimony that he could not say, in terms of probabilities, whether the catheter segment lodged near Smith's heart would cause *future* medical issues (such as pulmonary hypertension), and on the basis of this partial bit of Hoffman's testimony, falsely claimed that Hoffman did *not* testify to any harm suffered by Smith at all. Smith argued that, contrary to Robinson's twisted rendition Hoffman's testimony, Hoffman clearly testified that Robinson's breach of the standard of care *caused* the severed catheter segment to be left inside Smith's pulmonary artery. Smith suggested that Robinson conveniently obfuscated this testimony.

Smith also pointed out that in taking Hoffman's deposition, Robinson's attorney directed his questions to future medical issues rather than the proximate cause of the retained catheter segment and the implications of the retained catheter segment for Smith's mental well-being. She posited the court could therefore not preclude (1) Hoffman from testifying about the causal nexus between Robinson's breach of the standard of care and retention of the severed catheter segment in her body, and (2) Smith herself from testifying about her resulting emotional distress.

With regard to Robinson's contention that Smith could not show that Robinson's breach of the standard of care caused her any harm, Smith emphasized that Robinson's briefs focused on "future injuries of [pulmonary] hypertension and the fragment going 'downstream,' " but not "the issue of proximate causation of the catheter being left behind in Ms. Smith's right pulmonary artery as a result of Dr. Robinson's negligence." She further stated (quoting from one of her earlier briefs): "'Future potential injuries and past mental and emotional distress are unrelated and independent of each other. Potential injuries or complications in the future and Plaintiff's mental and emotional distress

30.

already suffered are being improperly conflated.' " Smith posited: "Therefore Dr. Hoffman should not be precluded from testifying about his opinions on the breach of the standard of care causing the foreign body object, the broken catheter section … being left behind." She also noted, citing *Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154, 186 (*Godfrey*) and *Vines v. United States* (2008 E.D. Cal.) 2008 WL 4470795 (*Vines*), that "[e]xpert testimony is not required to establish emotional distress; lay opinion alone can be sufficient."[4]

Finally, Smith argued that Robinson's dispositive motion should be denied because the doctrine of res ipsa loquitur applied. Citing *Brown v. Poway Unified School District* (1993) 4 Cal.4th 820, 825 (*Brown*), she stated: " 'Res ipsa loquitur is a doctrine affecting the burden of producing evidence applicable to certain kinds of accidents that are so likely to have been caused by a defendant's negligence that, in the Latin equivalent, "the thing speaks for itself." ' " She added, again quoting *Brown* at page 825 and citing Evidence Code section 646, subdivision (b): " [']If applicable, the doctrine of

---

[4] Smith submitted a declaration in support of her opposition to Robinson's dispositive motion in limine (effectively, an offer of proof as to her potential trial testimony regarding her emotional distress damages). In the declaration, among other things, Smith stated: "I have suffered significant stress with the knowledge that a piece of plastic that is not supposed to be in my body is in my right pulmonary artery, that it has passed through my heart. I don't want some broken piece of catheter left in me. I don't want plastic in the main artery to my right lung. I want it out, but I am told that I face significant risks, and even death, if I try and have it removed. I think about this often and it causes me stress." Smith continued: "I am upset and angry that the plastic was left in me. It makes me feel like I don't matter enough for a doctor to be careful and not leave things that shouldn't be left inside of me, and that I could die if I try to get it removed. Why didn't he realize that he left something inside of me? He put it in, why didn't he take all of it out? Smith added: "I am now not as trusting of doctors as I used to be. I wonder sometimes if he knew and just left it behind thinking no one would ever know. This leads me to question whether what doctors say to me is true or not. It causes me to be afraid every time I have something done to me, or take a medicine, that I may not be getting the straight information."

31.

res ipsa loquitur establishes a presumption of negligence requiring the defendant to come forward with evidence to disprove it.['] "

Smith continued, quoting *Brown, supra,* 4 Cal.4th at pages 825-826: " 'The presumption that an accident was caused by the defendant's lack of care arises only when the evidence satisfies three conditions: (1) The accident must be of a kind that ordinarily does not occur unless someone is negligent; (2) the accident must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the accident must not have been due to any voluntary action or contributory fault of the plaintiff.' " She posited: "Medical devices, or parts thereof [that are not intended to be retained inside the body], do not typically get left inside of patients during surgery in the absence of negligence on the part of the surgeon. Here, Defendant Dr. Robinson had complete control over every aspect of both of Plaintiff's two surgeries, implantation and explantation. He was solely responsible for the specific chest port catheter that was used, the anesthesia selected, the x-rays taken and not taken, and the surgical procedures themselves." Moreover, Smith herself was under sedation during the implantation surgery and under general anesthesia during the explantation or removal surgery.

Smith argued, quoting *Blackwell v. Hurst* (1996) 46 Cal.App.4th 939, 946: " 'The jury should have been permitted to make a factual finding on the issue of [the applicability of] the doctrine of res ipsa loquitur. If the jury determined that, in fact, the injury does not ordinarily occur absent negligence, the doctrine of res ipsa loquitur would have resulted in an inference of negligence that [Robinson] may or may not have been able to overcome. We cannot hold the error harmless.' " In short, Smith contended that Robinson's dispositive motion failed.

Robinson filed a reply to Smith's opposition to his dispositive motion in limine. Robinson argued that his dispositive motion should be granted because Smith had not suffered any physical injury, the case cited by Smith, *Vines*, *supra*, 2008 WL 4470795, was distinguishable on that basis, among others, and Smith's lay testimony as to any

32.

emotional distress she suffered was insufficient to support her claim for damages. Robinson contended:

> "In stark contrast, there exists extensive legal authority from the cases involving recovery of damages for emotional distress, i.e., the line of cases addressing fear of cancer, HIV, or AIDS, which directly addresses whether a plaintiff can recover for emotional address damages where no physical injury exists. <u>This is the precise issue before this Court.</u> Those cases hold that in the absence of a physical injury, a plaintiff may only recover damages for emotional distress, i.e., emotional upset, if she establishes through reliable medical or scientific opinion that it is more likely than not that she will suffer the feared of injury as a result of the event, that is, retention of a catheter fragment. (See *Potter v. Firestone Tire and Rubber Co.* (1993) 6 Cal.4th 965, 997 [(*Potter*)]; see also CACI 1622.) As discussed thoroughly in Defendant's moving papers, the same standard should be applied to the case at bar." (Emphasis in original)

Concurrently with his reply to Smith's opposition to his dispositive motion, Robinson filed an objection to Smith's declaration in support of her opposition. (See footnote 4, *ante*.) Robinson objected to Smith's declaration mainly on grounds of relevancy and calling for an expert opinion.

The court held a hearing on Robinson's dispositive motion. At the hearing, the court addressed Smith's attorney: "*Potter*[, *supra*, 6 Cal.4th 965,] is controlling on these types of cases dealing with future anxiety, fear, et cetera. That's why *Potter*, which was an opinion … by the California Supreme Court, talks about the fear of cancer, fear of AIDS, fear of those types of things. Isn't that what your client is doing here? She is fearful of what's going to happen in the future because that portion of the catheter is left in her?" (Italics added.)

Smith's attorney responded:

> "No, no, no. AIDS, HIV, cancer, all of those things are a special category because of the special nature of this future that's unpredictable and that they might experience or experience emotional distress because of what might happen in the future.

"I have taken out the hypertension.  I have taken out the migration.  We're not having a fear of those things in the future, ergo [CACI No.] 1622 is irrelevant because we're not talking about these two things, my exposure to cancer, my exposure to HIV, hypertension in our case, or migration [of the retained catheter segment].  They're out of the picture.  It comes down to now, does leaving a physical object inside her body, is there – at this point you must accept the inference that it will indicate to a jury that she suffered some sort of emotional distress damage.  We're looking at the cases in the 3,000 series [of CACI], noneconomic damages.

"She has already experienced some of this.  This isn't about just the future.  *This happened years ago.*  She felt – and I could read them to you, but it's straight out of her declaration, your Honor.  She has indicated that she has felt stressed.  She has felt fear that it might move.  They can have an expert say it's not going to move.  Then a jury can say that's not reasonable.

"She has said she has stress with the knowledge of the plastic inside her body.  It's not supposed to be there.  It [has] gone through her heart.  I don't want some broken piece of plastic inside of me.  She has the right to say to a jury I'm suffering some distress because this piece of plastic is left inside of me.

"You don't need an expert for that one.  It says, I don't want plastic in the main artery to my right lung.  I want it out, but I'm told that I'd face significant risk, even death, if I try to have it removed.  I'm upset and angry that the plastic was left inside of me.  It makes me feel like I don't matter enough for a doctor to be careful and not leave things that shouldn't be left inside of me.  I'm not as trusting of doctors as I used to be.  I am upset the doctor is saying even if he did me wrong, it doesn't matter.  It makes me feel upset and stressed that I have plastic in my main artery.

"I don't need an expert for that.  I have demonstrated to you that there is testimony which if the court follows the standard, we get the inference of, the jury is going to hear that and can believe it.  I don't need an expert.  I don't need a[n] expert to say since this object was left in her body, she's been stressed, upset, angry.  I don't need an expert for that.

"This is no in the future she might get AIDS or she might get cancer.  *This [has] already happened*.  She's experienced these things.  She's experiencing these things.

[¶] … [¶]

34.

"Undoubtedly it's problematic that a piece of plastic was left inside her, period. From that, damages flow which are how she felt and experienced something today and how she feels about that for the rest of her life. Not hypertension, not migration, not AIDS, not cancer, none of that.

"It is the general emotional distress damages that we provide in every other case without an expert." (Italics added.)

The court next asked Smith's counsel: "[H]ow do you get around causation[?] In a Reader's Digest version world, that is the issue before the court." Smith's counsel responded: "Question, did it cause the plastic to be left behind. That's the causation we're talking about. Duty, breach, causation, caused the plastic to be left behind … We're looking at duty, breach, causation. The issue is something was left behind." Counsel added: "Was there a duty, yes. Was there a breach, that's the standard of care question which [Hoffman] said, I say yes. They're saying no … Duty, breach, caused, the thing to be left behind." Counsel continued: "The court's inquiry regarding experts stops there. Then my client said, because this is inside of me, these are my damages. That's just the way it works in any case I do, medical malpractice, personal injury."

Counsel emphasized: "We have got duty, breach, causation, at [best] as a presumption, definitely as a triable issue of fact." Counsel rejected Robinson's contention that "you have to have medical causation of everything," including emotional distress. Counsel observed: "If the court is going to say that it needs an expert [to show emotional distress], then every PI case is going to need an expert to say, yeah, this caused some pain … To a reasonable degree of medical certainty, they suffered some pain. I mean, to me that's an unfathomable change in how we do these cases."

The trial court ruled from the bench. The court stated: "The court first notes that the court has reviewed the declaration of Budina Smith filed February 9th, 2023[,] on this particular motion. The central issue revolving around for the court is whether or not the expert testimony was needed to meet the elements of causation setting up foundational issues [and] spring-boarding into and permitting emotional damages." The court found

35.

that expert testimony was necessary, under *Potter*, *supra*, 6 Cal.4th 965, 997, to establish causation and damages and that Smith's expert's testimony was insufficient. The court ruled: "[T]his court … therefore, determines the plaintiff's declaration to be irrelevant and sustains all of the objections." The court further granted Robinson's dispositive motion.

## H.     Trial Court's Order on Robinson's Dispositive Motion

Following the hearing on Robinson's dispositive motion, the trial court issued, the same day, a minute order granting the motion and dismissing the case. The court's order stated: "Defendant's dispositive Motion in Limine [was] filed at the direction of the Court. The motion is a follow up to the Court's Granting of the Defendant[']s In Limine No. 22, which precluded the Plaintiff's expert, Gary Hoffman, M.D., from offering any medical causation opinions at trial. The Defendant's dispositive motion is GRANTED."

The court's order further provided:

> "In *Potter v. Firestone Tire and Rubber Co.* (1993) 6 Cal.4th 965, 997, the California Supreme Court held: Damages for fear of cancer may be recovered only if the plaintiff pleads and proves that (1) as a result of Defendant's negligent breach of a duty owed to the Plaintiff, the plaintiff is exposed to a toxic substance which threatens cancer; and (2) the plaintiff's fear stems from a knowledge, corroborated by reliable medical or scientific opinion, that it is more likely than not that the plaintiff will develop the cancer in the future due to the toxic exposure. Plaintiff's expert can testify as he did during his expert deposition, to a reasonable degree of medical probability that [her] risk of contracting pulmonary hypertension is increased with the presence of the catheter (i.e. that the risk has increased from x% to y%). Plaintiff's expert cannot testify that it is more likely than not that plaintiff will develop pulmonary hypertension (i.e. greater than 50%) because such opinion was not offered during his expert deposition. Accordingly, [*Potter*] bars Plaintiff from offering evidence of emotional distress arising from her fear that she will develop pulmonary hypertension in the future." (Italics added.)

The court concluded that Smith therefore had no case and granted Robinson's dispositive motion. In turn, the court vacated "today's jur[y] trial date."

36.

**DISCUSSION**

I.      **Trial Court Erred in Granting Robinson's Dispositive Motion**

        A.      *Standard of Review*

        The parties agree that the applicable standard of review is the standard we apply in reviewing a trial court's grant of a motion for judgment of nonsuit following opening statement.

        "[W]hen the trial court utilizes the in limine process to dispose of a case or cause of action for evidentiary reasons, we review the result as we would the grant of a motion for nonsuit after opening statement, keeping in mind that the grant of such a motion is not favored, that a key consideration is that the nonmoving party has had a full and fair opportunity to state all the facts in its favor, and that all inferences and conflicts in the evidence must be viewed most favorably to the nonmoving party." (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1595.) "In contrast, on appeal from a judgment following trial, appellate review favors the judgment." (*Id.* at pp. 1594-1595.)

        Where a trial court grants a motion in limine to exclude evidence already produced in discovery, whereby the plaintiff's causes of action fail as a matter of law, the court's order is the functional equivalent of a grant of nonsuit. (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27-28 (*Edwards*).) "A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor." (*Id.* at p. 28; *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 (*Nally*) ["A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by [the] plaintiff is insufficient to permit a jury to find in his favor."].)

        The substantial evidence needed to defeat a nonsuit motion is "evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have

made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) A mere scintilla of evidence or evidence that is bare speculation or conjecture is not enough; rather, there must be some substance to the evidence upon which a reasonable person could rely. (*Nally, supra,* 47 Cal.3d at p. 291.)

We review a judgment of nonsuit de novo, applying the same standards as the trial court. (*Nally, supra*, 47 Cal.3d at p. 291; *Edwards*, *supra*, 53 Cal.App.4th at p. 28 ["We are bound by the same rules as the trial court. Therefore, on this appeal we must view the evidence most favorably to appellants, resolving all presumptions, inferences, and doubts in their favor, and uphold the judgment for respondents only if it was required as a matter of law."].)

### B. Smith's Medical Negligence Claim (Physical Injury)

"Generally, 'negligence' is the failure to exercise the care a reasonable person would exercise under the circumstances. [Citation.] Medical negligence is one type of negligence, to which general negligence principles apply." (*Massey v. Mercy Medical Center Redding* (2009) 180 Cal.App.4th 690, 694.) "The elements of a medical malpractice claim are ' " '(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.' " ' " (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 468, fn. 2 (*Avivi*).) "Both the standard of care and [a defendant's] breach must normally be established by expert testimony in a medical malpractice case." (*Id*. at p. 467.) In addition, " '[c]ausation must be proven within a reasonable medical probability based upon competent expert testimony.' " (*Dumas v. Cooney* (1991) 235 Cal.App.3d 1593, 1603; see also *Sanchez v. Kern Emergency Medical Transportation Corp*. (2017) 8 Cal.App.5th 146, 153 (*Sanchez*) [" 'Whenever the plaintiff claims negligence in the medical context, the plaintiff must present evidence

from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff.' "].)

Here, there is no dispute as to the first element, namely that Robinson had a duty to use due care in performing the implantation and explantation surgeries on Smith, his patient. As to the second element, Hoffman testified in detail that Robinson breached the duty of due care during both implantation and explantation. As to implantation, Hoffman explained that Robinson breached the standard of care in inserting the catheter in the subclavian vein in too medial of a position, thereby subjecting the catheter to compression at the junction of the clavicle and the first rib at the top of the rib cage and resulting in a part of it being pinched off and severed. Robinson's medial placement of the port-a-cath conflicted with the instructions that came with the port-a-cath; the instructions warned against medial placement of the catheter. Next, Hoffman noted that Robinson failed to measure and record the length of catheter that was implanted, which failure was a clear breach of the standard of care. The device's instructions also called for measuring and recording the length of catheter that was implanted. Measuring and recording the length of catheter implanted was necessary so that when the implanted catheter was removed from the body, it could be measured to ensure the entirety of the implanted catheter had been removed.

Hoffman testified that Robinson also breached the standard of care during the explantation surgery. Robinson did not get an x-ray of Smith's chest following the removal of the device; an x-ray would have revealed the severed segment of catheter that was left inside Smith's chest, within a blood vessel near her heart. Hoffman further indicated that Robinson should have appreciated that the length of catheter he removed was simply too short to have been the entire, implanted catheter. Had Robinson timely realized he had removed only a partial segment of the catheter, he could have taken immediate steps to facilitate prompt extrication of the retained, severed catheter fragment.

39.

Hoffman also testified that the aforementioned breaches of the standard of care committed by Robinson resulted in harm to Smith. Hoffman noted the breaches led to the severed segment of catheter being left in Smith's body and remaining undetected for several years, in the course of which time it passed through her heart and became lodged at a "significant spot" close to her heart, that is, the juncture of the main pulmonary artery and the right pulmonary artery, which area was now partially obstructed. Hoffman said relevant imaging indicated part of the severed catheter appeared to be "in the *main* pulmonary artery," which was "a setup for even more possibility of having a clot because now you have a free end that can't epithelialize kind of waving in the breeze with blood flowing … by it."

Hoffman stated: "It's obvious it's flapping around and creates problems. But the part about – even if it's epithelialized, it's more toward the size of the lumen – lumen means opening – the size of the lumen through which her blood is flowing. And just having an obstruct[ion]—remember, this catheter went in, and it doubled back on itself." Hoffman indicated that more probably than not, Smith's blood flow to the right pulmonary artery was significantly decreased on account of the presence of the severed catheter segment at the spot where the right pulmonary artery branches off from the main pulmonary artery. Hoffman noted that blood flow through the blood vessels in the lungs is responsible for oxygenating the tissues of the lungs. His testimony supported an inference that reduced blood flow to the right pulmonary artery was suboptimal, as it would limit the oxygenation of the right lung.

Hoffman also stated that he would advise Smith to consider just living with the severed catheter fragment in her pulmonary artery as attempting to remove it was extremely risky and could result in bleeding to death. He described Smith's situation as being between a rock and a hard place. Hoffman pointed out: "*And of course then she's going to have to live with the psychological aspects of living with it and what's going to happen down the road*. But that's another risk. But that's manageable." (Italics added.)

40.

In light of the problems associated with the presence of the severed catheter segment, Hoffman explicitly stated in his declaration: "I further disagree with Dr. Robinson's expert witness[,] Dr Macho[,] when he essentially describes a section of catheter tubing coiled up and lodged inside Plaintiff's right pulmonary artery as a benign 'no harm, no foul' situation that caused Plaintiff no injury." Hoffman's declaration and deposition testimony constituted substantial evidence for a jury to find that Smith was harmed by the presence of the severed catheter segment in her pulmonary artery (i.e., that the presence of the severed catheter—an unwanted foreign object— was an injury to Smith). Indeed, Hoffman testified at deposition that no one would voluntarily want to have a physical object lodged inside a critical blood vessel, when the object at issue was not supposed to be there.

As for the causal nexus between Robinson's breaches of the standard of care and the harm or injury suffered by Smith, Hoffman expressly stated in his declaration that Robinson's breach of the standard of care in implanting the catheter *medially* in the subclavian vein, in contravention of the device's instructions for use, was "more likely than not" the "cause of the catheter fracture in this case, causing the catheter to sever into two pieces while still inside Plaintiff's chest." Hoffman also testified at deposition as follows: "I think I can … just simply say that [the catheter] was placed too medially and as a result fractured. And the fracture was the result of the location and – location of the placement of the catheter."

Hoffman's declaration and deposition testimony constitute substantial evidence for a jury to find to a reasonable medical probability, that Robinson's breach was a substantial factor in causing the harm suffered by Smith. (*Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1210 ["California law on causation is 'substantial factor' "]; see *Dougherty v. Lee* (1946) 74 Cal.App.2d 132, 136 [" 'It is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other

conclusion.' "]; see also Haning, et al., *Cal. Practice Guide: Personal Injury* (The Rutter Group 2022) ¶ 2:2405 "Causation is a question of *reasonable probability*; 'legal cause' need not be proved with certainty, but mere *possibility* is insufficient to establish a prima facie case. Thus, the issue is whether it is *more likely than not* that plaintiff's injury was a result of defendant's act or omission."].)

Finally, for purposes of this analysis, we note that Robinson's briefing to the trial court, and to this court as well, both mischaracterizes and fails to address the full scope of Hoffman's opinions on causation. For example, in his motion in limine 22, Robinson argued: "Defendant [Robinson] seeks an order from this court precluding Plaintiff's retained expert, Gary Hoffman, M.D., from offering any medical causation opinions at trial, based on the fact that Dr. Hoffman testified at deposition that he could not state any of his causation opinions to a reasonable degree of medical probability and, in fact, 'can't speak to causation because it hasn't yet.' " (Emphases omitted.) Robinson further argued: "In addition, Dr. Hoffman testified that he could not state … to a reasonable degree of medical probability that Plaintiff will suffer *any* injury as a result of the retained catheter fragment. [¶] … [¶] Therefore, Dr. Hoffman should be precluded from offering any medical causation opinions at trial, as in his own words: 'I can't speak to causation.' " (Underlining omitted.)

However, it is very clear from Hoffman's deposition that Hoffman made these statements strictly in the context of the probability of Smith developing pulmonary hypertension over time or in the future. Hoffman did not, by any means, state that he had no causation opinions whatsoever. Specifically, when Robinson's counsel asked Hoffman whether Hoffman had told him all his causation opinions, Hoffman clarified that, at that point, he was merely addressing causation in the context of pulmonary hypertension as a possible outcome of the retained catheter. Hoffman stated: "If she gets pulmonary hypertension … most likely more probably than not it's due to the retained catheter. So I'm sort of answering it backwards because we don't know what's going to

happen to her. *I can't speak to causation because [pulmonary hypertension] hasn't happened yet.*" (Italics added.) At other times during his deposition, Hoffman certainly expressed other causation opinions, as discussed above. Accordingly, we conclude the trial court erred in granting Robinson's motion in limine 22, to the extent the trial court's ruling encompassed *all* of Robinson's causation opinions, rather than merely his causation opinions regarding the likelihood that Smith would develop pulmonary hypertension or regarding the likelihood that the catheter fragment would further migrate within Smith's body.

In sum, the evidence reflected in the record was sufficient for a jury to find the elements of Smith's claim of medical negligence. Furthermore, were Smith to establish her claim of medical negligence at trial, she would be entitled to damages arising from Robinson's negligence, including emotional distress damages based on the fact that as a result of Robinson's negligence, an unwanted catheter fragment had passed through her heart and was lodged in a critical blood vessel supplying oxygenated blood to her lungs. (See *Selden v. Dinner* (1993) 17 Cal.App.4th 166, 174 (*Selden*) [in negligence cases, a plaintiff can recover emotional distress damages where he or she has suffered an injury and emotional distress is a 'parasitic' item of damages]; *Thing v. La Chusa* (1989) 48 Cal.3d 644, 651 (*Thing*) [same]; see Thomas, et al., Cal. Civ. Prac. Torts § 11:1 (2025) ["A plaintiff is entitled to compensatory damages for physical pain and mental suffering that [ac]company or otherwise result from physical injury."].) "The range of mental or emotional injury subsumed within the rubric 'emotional distress' and for which damages are presently recoverable 'includes fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation and indignity, as well as physical pain.' " (*Thing*, *supra*, at pp. 648-649.)

Further, "[t]he law in this state is that the testimony of a single person, *including the plaintiff*, may be sufficient to support an award of emotional distress damages." (*Knutson v. Foster* (2018) 25 Cal.App.5th 1075, 1096; see *Vines, supra,* 2008 WL

4470795, *6 ["Expert testimony is not required to establish emotional distress; lay opinion alone can be sufficient."].) Testimony of an expert witness is required when the subject matter "is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) As reflected in Smith's declaration attached to her opposition to Robinson's dispositive motion, the emotional distress to which she would testify is not beyond the common experience of jurors. Smith's emotional distress damages arise, *inter alia*, from her feelings of shock, anxiety, grief, and concern on account of Robinson's negligence, the severed catheter fragment lodged in her right pulmonary artery, and related ill effects. Smith could testify to these points. Expert testimony was not required. (See *Vines*, *supra*, at *6 ["the issue of whether the knowledge that … there is a foreign object in his back caused plaintiff's 'emotional upset' does not necessarily require specialized knowledge"]; see also *Godfrey*, *supra*, 128 Cal.App.3d at p. 186.) Accordingly, the trial court erred in sustaining Robinson's objection to Smith's declaration on grounds of relevancy, lacks-foundation, calls-for-speculation, and calls-for-expert-testimony.

### C. Smith's "Direct Victim" Negligence Claim (No Physical Injury)

To the extent Smith could show at trial that she suffered serious emotional distress on account of Robinson's breach of the standard of care, she would be entitled to recover emotional distress damages even if she failed to establish that Robinson's breach had harmed her physically. (See Thomas, et al., Cal. Civ. Prac. Torts § 11:3, *supra* ["Where a tortious act causes emotional distress without any concurrent physical injury, the plaintiff may still recover emotional distress damages under a negligent infliction of emotional distress claim."].) "[A] cause of action to recover damages for negligently inflicted emotional distress will lie … in cases where a duty arising from a preexisting relationship is negligently breached." (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1073-1074 (*Burgess*) [a "direct victim" claim alleges emotional distress was suffered as a proximate result of a defendant's breach of a duty that is assumed by the defendant, or imposed on

the defendant as a matter of law, or that arises out of the defendant's preexisting relationship with the plaintiff].)

In *Burgess*, the plaintiff mother sought to recover damages from her obstetrician for the emotional distress she suffered when her infant son was severely injured in the course of delivery. The court found the doctor's duty to the mother included preventing injury to the fetus she was carrying. In finding the mother could therefore recover for the distress she suffered, the court stated: "[O]nce the scope of the duty of care assumed by [the doctor] to [the mother] is understood, [the mother's] claim for emotional distress damages may simply be viewed as an *ordinary professional malpractice claim*, which seeks as an element of damage compensation for her serious emotional distress. The elements of a claim for professional negligence incorporate a specific standard of care into the elements of a negligence claim." (*Burgess*, *supra*, 2 Cal.4th at p. 1077, italics added; Thomas, McGhee, Kahn, & La Scala, Cal. Civ. Prac. Torts § 11:3, *supra* ["negligent infliction of emotional distress is not an independent tort, but the tort of negligence to which the traditional elements of a negligence cause of action apply"].) *Burgess* clarified that the doctor's breach of the duty of care arising from the physician-patient relationship between the doctor and the mother "is sufficient to satisfy the elements of a claim for professional malpractice on [the mother's] behalf." (*Burgess*, *supra*, at pp. 1078, 1079.)

Just as in *Burgess*, Smith's relationship with Robinson was a physician-patient relationship. The duty imposed on Robinson by virtue of this relationship was to treat her within the standard of care in implanting and removing the port-a-cath. (See *Selden*, *supra*, 17 Cal.App.4th at pp. 175-176.) Hoffman's testimony was sufficient for a jury to find that Robinson negligently breached the duty he owed to Smith on account of their preexisting relationship, resulting in the severed catheter fragment going through her heart and lodging in her right pulmonary artery. (See *Burgess*, *supra*, 2 Cal.4th at p. 1079 ["Moreover, even if Burgess had failed to allege physical injuries, physical injury

is not a prerequisite for recovering damages for *serious* emotional distress, especially when, as here, there exists a 'guarantee of genuineness in the circumstances of the case.' [Citation.]  Serious emotional distress itself satisfies the damage element of Burgess's cause of action."].)  Smith could therefore recover damages for ensuing serious emotional distress.  (See *Burgess*, *supra*, 2 Cal.4th at p. 1079 [under the direct victim theory, the emotional distress must be "serious"]; CACI No. 1620.)

### D. Potter v. Firestone *is Inapplicable*

Here, the trial court erroneously applied *Potter v. Firestone* so as to grant Robinson's dispositive motion.  *Potter v. Firestone* held:

> "To summarize, we hold with respect to negligent infliction of emotional distress claims arising out of exposure to carcinogens and/or other toxic substances:  Unless an express exception to this general rule is recognized, *in the absence of a present physical injury or illness*, damages for fear of cancer may be recovered only if the plaintiff pleads and proves that (1) as a result of the defendant's negligent breach of a duty owed to the plaintiff, the plaintiff is exposed to a toxic substance which threatens cancer; *and* (2) the plaintiff's fear stems from a knowledge, corroborated by reliable medical or scientific opinion, that it is more likely than not that the plaintiff will develop the cancer in the future due to the toxic exposure.  Under this rule, a plaintiff must do more than simply establish knowledge of a toxic ingestion or exposure and a significant increased risk of cancer.  The plaintiff must further show that based upon reliable medical or scientific opinion, the plaintiff harbors a serious fear that the toxic ingestion or exposure was of such magnitude and proportion as to likely result in the feared cancer." (*Potter, supra,* 6 Cal.4th at p. 997, italics added.)

At the hearing on Robinson's dispositive motion, Smith's counsel made clear that Smith was not seeking damages based simply on a *fear* that (1) she would develop pulmonary hypertension in the future; or (2) the severed catheter fragment would migrate further in her body in the future.  Rather, Smith sought emotional distress damages related to the fact that the severed catheter fragment had been lodged as an unwanted, foreign, physical object in her right pulmonary artery for several years, such that, as

46.

discussed above, it had certain presently existing and ongoing deleterious effects,[5] and/or resulted in serious emotional distress based on a number of factors, in a situation where Smith had a preexisting relationship with Robinson. Accordingly, *Potter v. Firestone* is inapposite and the trial court' reliance on its holding was error. We conclude the trial court erroneously granted Robinson's dispositive motion in limine.

### D.       *Doctrine of Res Ipsa Loquitur*

Smith contends that the trial court erred in finding that the doctrine of res ipsa loquitor did not apply and dismissing the case. We agree.

" 'Whenever the plaintiff claims negligence in the medical context, the plaintiff must present evidence from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff.' " (*Sanchez*, *supra*, 8 Cal.App.5th at p. 153.)

"A narrow exception to this rule exists where ' " 'the conduct required by the particular circumstances is within the common knowledge of the layman.' [Citations.]" ' [Citation.] This exception is, however, a limited one. It ... applies only when the plaintiff can invoke the doctrine of res ipsa loquitur[,]" "i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been

---

[5] To the extent Smith establishes she suffered a physical injury, she would be entitled to parasitic emotional distress damages, including those based on a reasonable fear, if any, of contracting pulmonary hypertension in the future. (See *Potter v. Firestone*, *supra*, 6 Cal.4th at p. 981 ["Where a plaintiff can demonstrate a physical injury caused by the defendant's negligence, anxiety specifically due to a reasonable fear of a future harm attributable to the injury may also constitute a proper element of damages."], citing *Jones v. United Railroads of San Francisco* (1921) 54 Cal.App. 744 [affirming damages for emotional distress endured up to time of trial where plaintiff reasonably feared permanent disability in the future as direct and proximate result from physical injury received in accident].)

exercised.' " (*Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1542-1543; *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001.)

Res ipsa loquitur is a doctrine affecting the burden of producing evidence applicable to certain kinds of accidents that are so likely to have been caused by a defendant's negligence that, in the Latin equivalent, " 'the thing speaks for itself.' " (*Brown*, *supra*, 4 Cal.4th 820, 825.) If applicable, the doctrine of res ipsa loquitur establishes a presumption of negligence requiring the defendant to come forward with evidence to disprove it. (*Id.* at p. 825; Evid. Code, § 646, subd. (b); see *Baumgardner v. Yusuf* (2006) 144 Cal.App.4th 1381, 1389.)

" 'The doctrine of res ipsa loquitur is applicable where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the one responsible.' " (*Howe v. Seven Forty Two Co., Inc.* (2010) 189 Cal.App.4th 1155, 1161.) "All of the cases hold, in effect, that it must appear, either as a matter of common experience or from evidence in the case, that the accident is of a type which probably would not happen unless someone was negligent. In the absence of such a probability there would be no basis for an inference of negligence which would serve to take the place of evidence of some specific negligent act or omission." (*Zentz v. Coca Cola Bottling Co. of Fresno* (1952) 39 Cal.2d 436, 442-443.)

For res ipsa loquitur to apply, three conditions must be met: (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been caused by any voluntary action or contribution on the part of the plaintiff. (*Ybarra v. Spangard* (1944) 25 Cal.2d 486, 489.) The issue of whether a plaintiff has established these three conditions before being entitled to a presumption of negligence is a question of fact *for the jury*. (*Newing v. Cheatham* (1975) 15 Cal.3d 351, 359; *Danner v. Atkins* (1956) 47 Cal.2d 327, 331.)

Here, Robinson admitted that he implanted the port-a-cath, and that the piece of catheter lodged in Smith's pulmonary artery came from that port-a-cath. Furthermore, Robinson's own expert, Dr. Macho, declared that the reported rate of intravenous catheter fracture is only 0.1%. This evidence suggests that the catheter fracture that occurred here, resulting in the severed catheter fragment to be retained in Smith's body, would ordinarily not occur in the absence of somebody's negligence.[6]

Second, since Robinson performed both the implantation and explantation surgeries, it would appear that the agency or instrumentality was within his exclusive control. Finally, since Smith was under sedation during the surgeries, she reasonably did not do anything to cause a fragment of the catheter to pinch-off and remain in her body. Under these circumstances, the question of the applicability of the doctrine of res ipsa loquitor should properly have been submitted to the jury. (See CACI No. 518.) Accordingly, the trial court erred in granting Robinson's dispositive motion and dismissing the case.

---

[6] Indeed, Smith's expert, Hoffman, stated in a declaration: "It is my further opinion that it falls below the standard of care virtually any time a surgeon leaves part of a medical device inside a patient's body following a surgical procedure intended to remove the entire medical device, as Dr. Robinson did in this case." As for Dr. Macho's point that the reported rate of intravenous catheter fracture is only 0.1%, it is not clear whether Dr. Macho means that the *total* reported rate of intravenous catheter fracture is 0.1% or whether he means that the reported rate of *spontaneous* intravenous fracture is 0.1%. In any event, Dr. Macho's point suggests that in 99.9% of these cases, intravenous catheter fracture either does not occur or does not occur absent someone's negligence. Given this evidence, a jury could reasonably conclude that catheter fracture does not ordinarily occur in the absence of someone's negligence.

**DISPOSITION**

The judgment is reversed.[7]  The matter is remanded to the trial court for further proceedings consistent with this opinion.  Smith shall recover her costs on appeal.

FAIN, J.*

WE CONCUR:

SNAUFFER, Acting P. J.

DE SANTOS, J.

---

[7] In light of the disposition, we need not address Smith's final contention that "the trial court's procedural process was inappropriate and deprived [her] of the opportunity to present her claims to the jury."

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.